Brian S. King, #4610
Nediha Hadzikadunic, #15851
**BRIAN S. KING PC**
336 South 300 East, Suite 200
Salt Lake City, Utah 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| BRYAN D. and SHANNON D., <br><br> Plaintiffs, <br><br> vs. <br><br> BLUE CROSS BLUE SHIELD OF GEORGIA, and ATLANCO VENTURES, INC. MEDICAL BENEFIT PLAN, <br><br> Defendants. | **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT** <br><br><br> Civil No. 1:16-cv-00099 DN |

Plaintiffs Bryan D. ("Bryan") and Shannon D. ("Shannon") through their undersigned counsel and pursuant to F.R.Civ.P. 56, and DUCiv 56-1, submit the following Motion for Summary Judgment and Memorandum in Support against Defendants Blue Cross Blue Shield of Georgia (BCBSGA) and Atlanco Ventures, Inc. Medical Benefit Plan ("the Plan").

In this ERISA case, the protected health information in the administrative record is subject to the Stipulated HIPAA Qualified Protective Order, docket #30, and Standard Protective Order, docket #29, both filed on January 20, 2017. The Record consists of documents Bates stamped BCBS ("BCBS") 0001 through 0770.

INTRODUCTION

Bryan brought this lawsuit to recover expenses incurred during his daughter Shannon's treatment at Uinta residential treatment center that BCBSGA improperly refused to cover. Shannon was treated at Uinta from August 8, 2013 through November 12, 2015, and BCBSGA denied coverage asserting that the Plan did not include benefits for residential treatment.

Shannon suffered mental health issues throughout her childhood, which ultimately led to her admission at Uinta. Shannon was diagnosed with anxiety, depressive and learning disorders among other issues. Shannon's mental health condition caused her to struggle academically and socially having trouble forming and maintaining positive relationships. Shannon's depressive and anxiety disorders contributed to her inability to control her emotions and take accountability for her behavior.

This Court should reverse BCBSGA's denial of coverage for Shannon's residential treatment because the Plan's exclusion of coverage for residential treatment violated the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"). MHPAEA requires the Plan to provide benefits for mental health and substance use disorders that are on a par with medical and surgical benefits. The Plan included coverage for skilled nursing facilities and other sub-acute inpatient facilities, which are analogous levels of care for medical surgical benefits, but excluded benefits for residential treatment.

Second, Bryan appealed BCBSGA's denial in December of 2014, designating the appeal as applying to services provided on August 8, 2013, and forward. In its final denial letter from March 2015, BCBSGA considered only services provided from August 8, 2013, through August 31, 2013, failing to include in its consideration of Bryan's appeal services for the rest of claims from 2013, 2014 and 2015. BCBSGA was on notice about Shannon's continuous treatment at

Uinta because the claims for her treatment in those years were submitted to BCBSGA and were denied. Shannon was in treatment for 27 months, but BCBSGA in its response to Bryan's appeal for Shannon's treatment over that time frame, BCBSGA only considered and denied services provided in August of 2013. That was improper. This Court should consider that Bryan's pre-litigation appeal of BCBSGA's denial covered the services from August of 2013 through the entire period of Shannon's treatment ending in November 2015.

BCBSGA's denial of Bryan's claims should be reversed and Bryan should be awarded prejudgment interest and his attorney fees and costs.

## STATEMENT OF ELEMENTS AND UNDISPUTED MATERIAL FACTS

### STATEMENT OF ELEMENTS

A.    The District Court reviews a claim brought under 29 U.S.C. §1132(a)(1)(B) under a *de novo* standard of review unless the documents under which the plan is operated provide discretionary authority to the plan administrator. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

B.    Under a *de novo* standard of review, the District Court reviews the decision of the plan administrator for correctness without deferring to the plan administrator's decision. *Gilbertson v. AlliedSignal, Inc.*, 172 Fed. Appx. 857, 860 (10th Cir. 2006).

C.    The District Court's scope of review is generally limited to the pre-litigation appeal record without allowance for new facts or arguments being presented in litigation by either party. *Jewell v. Life Ins. Co. of North America*, 508 F.3d 1303, 1308 (10th Cir. 2007); *Murphy v. Deloitte & Touche Group Ins. Plan*, 610 F.3d 1151, 1159, fn. 4 (10th Cir. 2010); *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.,* 491 F.3d 1180, 1190-91 (10th Cir. 2007)

D.     Individuals claiming benefits under 29 U.S.C. §1132(a)(1)(B) must demonstrate they are entitled to those benefits under the terms of the ERISA plan. 29 U.S.C. §1132(a)(1)(B).

E.     A decision to deny benefits based on an unreasonable interpretation of plan terms is arbitrary and capricious. *Flinders*, 491 F.3d at 1193-1194; *McGraw v. Prudential Ins. Co. of America*, 137 F.3d 1253, 1259 (10th Cir. 1998).

F.     ERISA requires its fiduciaries to properly and consistently interpret and apply the language of benefit plans and to discharge their duties "solely in the interest of the participants and beneficiaries." 29 U.S.C. §1104(a)(1); 29 C.F.R. §2560.503-1(b)(5). These standards constitute "higher-than-marketplace" standards. *Glenn*, 554 U.S. 105, 115 (2008). Of particular importance under ERISA is the need for plan fiduciaries to accurately process claims by providing a "full and fair review" of all denied claims. *Id.*

## PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS

### The Plan

1. BCBSGA insures the Plan and is a foreign corporation that does business throughout the United States, including in the State of Utah. Complaint, ¶ 3 [docket # 2]; BCBSGA Answer, ¶ 4 [docket # 6], BCBS 0046.

2. Bryan is a participant in the Plan and Shannon is a beneficiary of the Plan. BCBS 0001.

3. BCBSGA is also the Plan administrator and processes: [a]ll notices of claims, proofs of loss, and clams forms" through its office in Columbus, Georgia, and complaints through the Grievances and Appeals Department, located in Los Angeles, California. BCBS 0051, 0176.

4. The benefits the Plan provides are described in the Certificate Booklet ("SPD"). BCBS 0046

5. The 2013 SPD provides that the Plan covers mental health and substance abuse

services:

> Treatment generally involves inpatient and outpatient services and may also include intensive outpatient/day treatment and **possibly residential treatment centers**.

BCBS 0140 (emphasis added).

6. The 2014 SPD provides that the covered services for mental health and substance abuse

treatment include:

> - **Inpatient Services** in a Hospital or any Facility that we must cover per state law. Inpatient benefits include psychotherapy, psychological testing, convulsive therapy, detoxification, and rehabilitation.
> - **Outpatient Services** including treatment in an outpatient department of a Hospital and office visits.
> - **Day Treatment Services** which are services more intensive than outpatient visits but less intensive than an overnight stay in the Hospital.

BCBS 0260 (emphasis in original).

7. The 2015 SPD Plan describes coverage for mental health and substance abuse services

including coverage for residential treatment:

> Covered Services include the following:
> - **Inpatient Services** in a Hospital or any Facility that we must cover per state law. Inpatient benefits include psychotherapy, psychological testing, electroconvulsive therapy, and detoxification.
> - **Outpatient Services** including office and treatment in an outpatient department of a Hospital or outpatient Facility, such as partial hospitalization programs and intensive outpatient programs.
> - **Residential Treatment** which is specialized 24-hour treatment in a licensed Residential Treatment Center. It offers individualized and intensive treatment and includes:
>   - Observation and assessment by a physiatrist weekly or more often,
>   - Rehabilitation, therapy, and education.

BCBS 0374 (emphasis in original).

8. The 2013, the 2014 and the 2015 SPDs define medical necessity as follows:

BCBSGA reserves the right to determine whether a service or supply is Medically Necessary. The fact that a [physician] has prescribed, ordered, recommended or approved a service or supply does not, in itself, make it Medically Necessary. BCBSGA considers a service Medically Necessary if it is:

- appropriate and consistent with the diagnosis and the omission of which could adversely affect or fail to improve the patient's condition;
- compatible with the standards of acceptable medical practice in the United States;
- not provided solely for your convenience or the conveniences of the [Physicians], health care provider or Hospital;
- not primarily Custodial Care;
- provided in a safe and appropriate setting given the nature of the diagnosis and the severity of the symptoms. For example, a Hospital stay is necessary when treatment cannot be safely provided on an outpatient basis; and
- cost-effective compared to alternative interventions, including no intervention. Cost effective does not always mean lowest cost. It does mean that as to the diagnosis or treatment of the Member's illness, injury or disease, the service is: (1) not more costly than an alternative service or sequence of services that is medically appropriate, or (2) the service is performed in the least costly setting that is medically appropriate.

BCBS 0203, 0318, 0434.

9. The 2013, the 2014 and the 2015 SPDs under "Notices" section describe Mental Health

Parity and Addiction Act:

The [MHPAEA] provides for parity in the application of aggregate [lifetime limits, calendar year dollar limits, and] treatment limitations (day or visit limits) on mental health and substance abuse benefits with dollar limits or day/visit limits on medical/surgical benefits. In general, group health plans offering mental health and substance abuse benefits cannot set [calendar year dollar limits, lifetime dollar limits, or] day/visit limits on mental health and substance abuse benefits that are lower than any such dollar limits or day visit limits for medical and surgical benefits. A plan that does not impose [calendar year dollar limits, lifetime dollar limits, or] day/visit limits on medical and surgical benefits may not impose such dollar limits or day/visit limits on mental health and substance abuse benefits offered under the Plan.

BCBS 0099, 0213, 0327.

10. The 2013 and the 2014 SPDs provide that Residential Treatment Centers are not covered

unless the law requires them to be covered. BCBS 0161, 0278.

11. The 2013 and the 2014 SPDs provided coverage for skilled nursing facilities:

[Benefits are available] when you require [i]npatient skilled nursing and related services for convalescent and rehabilitative care. [] The Facility or program must be licensed, certified or otherwise authorized pursuant to the laws of the state in which it is situated, as a Skilled Nursing Facility. Benefits are not available for Custodial Care.

BCBS 0144, 0263.

12. The 2013 and the 2014 SPDs covered rehabilitation services:

Benefits include [Inpatient rehabilitative] services in a Hospital, free-standing Facility, Skilled Nursing Facility, or in an outpatient day rehabilitation program.

Covered Services involve a coordinated team approach and several types of [therapy], including skilled [rehabilitative] nursing care, physical, occupational, and speech therapy, and the services of a social worker or psychologist.

To be [eligible for benefits], rehabilitation services must [be oriented toward] goals expected to be reached in a reasonable period of time. Benefits will end when [rehabilitation] is no longer Medically Necessary and someone stops progressing toward those goals.

BCBS 0143, 0263.

13. The 2013 and the 2014 SPDs provided coverage for hospice care stating that the services include the following:

1. Interdisciplinary team care with the development and maintenance of an appropriate plan of care.
2. Short-term Inpatient Hospital care when required in periods of crisis or as respite care.
3. Skilled nursing services [provided by and under the supervision of a registered nurse].
4. [Certified home health aide services and homemaker services provided under the supervision of a registered nurse].
5. Social services and counseling services provided by a qualified social worker.
6. [Dietary and nutritional guidance, including nutritional support such as intravenous feeding].
7. Pharmaceuticals, medical equipment, and supplies necessary for the palliative treatment of the Member's condition including oxygen and related respiratory therapy supplies.
8. Bereavement services, including assessment of the needs of the bereaved family and development of a care plan to meet those needs, both prior to and following the Member's death. Bereavement services are available to surviving Members of the immediate family for a period of one year after the death.

> Immediate family means your spouse, children, stepchildren, parents, and
> siblings.
> 9. [Palliative care (care which controls pain and relieves symptoms, but does not
> cure) which is appropriate for the illness.]

BCBS 0137, 0255-0256.

14. The 2013, the 2014 and the 2015 SPDs under General Provisions section provide:

> **Conformity with Law**
> Any [provision] of the Plan which in conflict with the laws of the state in which
> the Group Contract is issued, or with federal law, will hereby be automatically
> amended to conform with the minimum requirements of such laws.

BSBS 0191, 0307, 0422.

15. The 2013, the 2014 and the 2015 SPDs provide that members can file a Grievance, which

is a written complaint regarding the services or benefits received from the Plan. "The

complaint may involve your dissatisfaction with our administration or claim practices,

disenrollment proceedings, a determination of a diagnosis or level of service or denial of

a claim that you think should be paid by us." BCBS 0176, 0294, 0409.

16. The Plan's appeal process is described under "Grievance and External Review

Procedures" section in the 2013, the 2014 and the 2015 SPDs but there is neither

information about any external review procedures nor specifics about the number of

appeals allowed. *Id.*

**Shannon's Development and Treatment History**

17. Shannon struggled with depression, anxiety and behavioral issues before she was

admitted for treatment at Uinta Academy ("Uinta"). BCBS 0574.

18. Shannon's behavioral issues included self-harming, avoidance, running away, frequent

arguments and lying. *Id.*

19. Shannon struggled academically because of her learning disorder and had difficulties with peer relationships. She was also bullied at school. *Id.*

20. Shannon was admitted at Uinta on August 8, 2013, when she was 15 years old. *Id.*

21. After she was admitted to Uinta, Shannon was diagnosed with:

| | | |
|---|---|---|
| Axis I | 311 | Depressive Disorder NOS |
| | 300.00 | Anxiety Disorder NOS |
| | 313.89 | Reactive Attachment Disorder of Infancy or Early Childhood |
| | 315.9 | Learning Disorder NOS |
| Axis II | 799.9 | Diagnosis Deferred on Axis II |
| Axis III | | Deferred |
| Axis IV | | Problems with Primary Support Group |
| | | Problems Related to the Social Environment |
| | | Educational Problems |
| Axis V | | Current GAF: 50 Highest Past Year GAF: 50 |

*Id.*

22. Uinta developed Master Treatment Plan for Shannon outlining objectives to be pursued during her estimated 12-18 months of treatment. BCBS 0574- 0581.

23. Shannon's treatment at Uinta included individual, group and family therapy sessions. BCBS 0750.

24. The initial treatment at Uinta helped Shannon make some improvement in her mental health condition, but she continued to be in need for continuous treatment. Shannon's Treatment Plan Review dated March 11, 2014, evaluated Shannon's condition as follows:

> Shannon's ability to regulate her emotions is showing improvement, but continues to be limited. Shannon does not know how to seek positive attention, and continues to seek negative attention through lying, mimicking, and embellishment. Shannon is beginning to show improvement, but runs an extreme risk of relapse into old habits without a highly structured environment.
>
> BCBS 0746-48.

25. Shannon was discharged from Uinta on November 12, 2015. BCBS 0532.

**Claims and Appeal Process**

26. While Shannon was still being treated at Uinta, in July of 2014, Bryan requested approval for coverage of services provided from August 8, 2013 through July 17, 2014. BCBS 0010.

27. On July 21, 2014, BCBSGA denied coverage for the stated services basing it on the following rationale:

> A request for payment for Child/Adolescent Psychiatric Residential Treatment has been received and administratively denied. Our records indicate that the requested service is not covered benefit based on the coverage as described in the member's benefit plan certificate booklet. Specifically, the Level of Care requested in not a covered benefit under the member's contract.

   *Id.*

28. On December 29, 2014, Bryan appealed the denial of coverage for Shannon's treatment at Uinta disagreeing with BCBSGA "that the multidisciplinary residential treatment services Shannon is receiving are not a covered benefit under [the] plan." BCBS 0001.

29. Bryan argued that the BCBSGA denial letter was not signed and requested that all future correspondence with BCBSGA include signature of the person making coverage eligibility determinations. *Id*.

30. In addition, Bryan asked that BCBSGA include in the future correspondence "page numbers and direct citations" of the Plan's language BCBSGA utilized to make a determination in the case. *Id*.

31. To support his argument that residential treatment coverage was not excluded by the Plan, Bryan argued that BCBSGA relied on the exclusion in the Plan, which provide that residential treatment is not covered benefit "[u]nless required to be covered by law." BCBSGA 0002.

32. Bryan argued that coverage for residential treatment was required by the Patient Protection and Affordable Care Act ("PPACA") of 2010, and MHPAEA and cited to the "Conformity with Law" language providing that "[a]ny provision of the Plan which is in conflict with the laws of the state…or with federal law, will hereby be automatically amended to conform with the minimum requirements of such laws." *Id.*

33. Bryan also included in his December 29, 2014, appeal relevant provisions of MHPAEA, PPACA and comments on the Final Rules arguing that "[w]hile the Parity Act does not require the health plans to cover mental health services, if a plan does cover mental health services (and this Plan does), such coverage must be provided at 'parity' with medical/surgical benefits provided under the plan." BCBS 0002-0005.

34. Bryan requested "a full, fair and thorough [review] of Shannon's claims for the intermediate residential treatment she [was] receiving at Uinta for dates of service August 8, 2013, and going forward." BCBS 0007.

35. On February 24, 2015, BCBSGA responded to Bryan's appeal. It declined to consider Bryan's request for coverage arguing that the appeal was untimely because it was not received "within 180 days from the date you [got the] adverse decision." BCBS 0041.

36. BCBSGA's initial denial of coverage was issued on July 21, 2014. Bryan appealed the denial on December 29, 2014, well within 180 days from the receipt of the initial denial of coverage. BCBS 0010, 0001.

37. On March 16, 2015, BCBSGA reviewed the appeal and upheld the denial invoking the "What is not Covered" section in the Plan and arguing that residential treatment centers are not covered. BCBS 0043.

38. BCBSGA's March 16, 2015, final denial letter stated:

> If your health benefit plan is subject to the Employee Retirement Income Security Act of 1974 (ERISA), and you have exhausted all mandatory grievance rights, you have the right to bring a civil action in federal court under section 502(a)(1)(B) of ERISA.

BCBS 0043.

39. The final denial letter also provided that a "voluntary second level appeal" is available as well as "[i]ndependent external review…if our decision was based on medical judgment as provided by the Patient Protection and Affordable Care Act (PPACA)."  BCBS 0045.

40. From the beginning of Shannon's treatment at Uinta on August 8, 2013, through November 12, 2015, when she was discharged, claims for the services provided were regularly submitted to BCBSGA. BCBS 0453-0555.

41. With the BCBSGA's March 16, 2015, final denial Bryan exhausted his pre-litigation appeal obligations under the terms of ERISA and the Plan. BCBSGA 0045

**ARGUMENT**

I.   **THE STANDARD OF REVIEW IS *DE NOVO* BECAUSE THE PLAN'S EXCLUSION OF COVERAGE FOR RESIDENTIAL TREATMENT VIOLATES THE PARITY REQUIREMENT OF MHPAEA AND BCBSGA FORFEITED ANY DEFERENCE BECAUSE IT VIOLATED ERISA'S CLAIMS PROCEDURES ACT**

The proper standard of review in this case is *de novo* for two separate reasons. First, whether the Defendants may exclude coverage for residential treatment requires interpretation of MHPAEA. The Defendants have no discretionary authority to restrict the federal judiciary's ability to evaluate whether an ERISA plan administrator has properly interpreted and applied the requirements of federal statute. Second, BCBSGA has violated the requirements of ERISA's claim procedure regulations. In so doing, the Plan and BCBSGA forfeit any deferential standard of review to which they may otherwise be entitled.

//

**A. Discretionary Authority Language Cannot Restrict a Federal Court's Review of an ERISA Plan's Statutory Compliance**

Even if BCBSGA can somehow prove that it has discretionary authority to determine benefits under the Plan, its refusal to provide coverage for Shannon's residential treatment, when the Plan provided coverage for treatment in a skilled nursing facilities is a clear violation of MHPAEA, 29 U.S.C. § 1185a. BCBSGA refused to cover residential treatment Shannon received at Uinta from August 8, 2013 through November 12, 2015. BCBSGA's sole reason for the denial was that the Plan did not cover residential treatment. BCBS 0010. The Plan's exclusion of coverage for residential treatment is violation of MHPAEA and undeniably calls for a *de novo* standard of review being a purely legal determination.

At most, ERISA plan administrators are granted discretion to interpret and apply the terms of the plan, but have no authority to interpret and apply the terms of a federal statute. It makes no difference whether BCBSGA had a discretionary authority, because no discretionary language in the Plan can divest this Court of its plenary power to interpret the requirements of the MHPAEA and evaluate whether the language of the Plan violates that Act. "Questions of statutory interpretation are questions of law and are reviewable *de novo.*" *Mason v. Young* (*In re Young*), 237 B.R. 791, 796 (B.A.P. 10th Cir. 1999) (citing *Dalton v. Internal Revenue Service*, 77 F.3d 1297, 1299 (10th Cir. 1996)). Whether the MHPAEA required the Plan to cover residential treatment because the Plan provided coverage for mental health and substance abuse treatment and provided coverage for treatment at skilled nursing facilities is a question of law and this Court should apply *de novo* standard of review. *Joseph and Gail F. v. Sinclair Services Co.*, 158 F.Supp.3d 1239, 1258 (D. Utah 2016) (Shelby, J.).

**B.       BCBSGA's Violations of ERISA's Claims Procedure Regulations Call for a *De Novo* Standard of Review**

As part of providing an opportunity for a full and fair review to a plan participant whose

benefits under the Plan are being determined by a plan administrator, ERISA unequivocally requires that a plan administrator "[p]rovide claimants at least 180 days following receipt of a notification of an adverse benefit determination within which to appeal the determination." 29 C.F.R. § 2560.503-1(h)(3)(i).

BCBSGA initially denied coverage for Shannon's treatment on July 21, 2014. BCBS 0010. Bryan appealed the denial on December 29, 2014, well within the 180-day time period granted by ERISA to a plan participant to respond to an adverse benefit determination. BCBS 0001. Notwithstanding Bryan's timely appeal, on February 24, 2015, BCBSGA responded to Bryan's appeal by refusing to consider it claiming that the appeal was not received within 180 days from the date Bryan received the July 21, 2014, denial. BCBS 0041. BCBSGA's refusal to consider Bryan's timely appeal is a violation of ERISA claim procedures.

In *Gilbertson*, decided under the 1977 version of ERISA's claim procedure regulations, the Tenth Circuit ruled that so long as an ERISA plan administrator substantially complied with the claim procedure regulations, it did not forfeit the ability to obtain an abuse of discretion standard of review if the ERISA plan language provided discretionary authority. *Gilbertson*, 328 F.3d at 634-635. However, *Kellogg* and *Rasenack* involved claims arising after the 2000 Department of Labor update of the claim procedure regulations. The 2000 revision of ERISA claim procedure regulations included the "deemed exhausted" language in 29 C.F.R. § 2560.503-1(l) and made more clear that ERISA plans which did not comply with the claim procedure regulations forfeited the abuse of discretion standard of review. Both *Kellogg* and *Rasenack* involved ERISA plans that failed to comply with the time frames within which they were required to render decisions on a claimant's appeal of a denied claim. In both cases, the failure to provide a decision within ERISA's required time frame was so significant that the Tenth Circuit

had no problem saying that, regardless of whether the doctrine of substantial compliance applied

to the 2000 revision to the claim procedure regulations, the "deemed exhausted" language of 29

C.F.R. §2560.503-1(l) applied to require *de novo* review.  Both cases avoided deciding the

question of whether a plan administrator who does not strictly comply with the claim procedure

regulation falls within the language of 29 C.F.R. §2560.503-1(l) and forfeits a deferential

standard of review.

In *Halo v. Yale Health Plan*, 819 F.3d 42 (2nd Cir. 2016), the Second Circuit tackled that

specific issue and provided a detailed analysis of whether violating ERISA's claim procedure

regulations automatically calls for a *de novo*, rather than abuse of discretion, standard of review.

*Halo* involved medical claims for which the ERISA plan did not comply with the claim

procedure regulations. The Second Circuit ruled that the language of 29 C.F.R. § 2560.503-1(l)

identifying the "deemed exhausted" aspect of the claim procedure regulations, together with the

language of the preamble to the 2000 revision to the claim procedure regulation, 65 Fed. Reg. at

70,255, calls for a *de novo* standard of review where the claim procedure regulations are violated

to the degree that the "deemed exhausted" language of 29 C.F.R. § 2560.503-1(l) is triggered.

*Halo*, 819 F.3d at 52-56. *Halo* accords with Tenth Circuit precedent in *Kellogg* and *Rasenack*,

among other cases.

BCBSGA's rejection of Bryan's appeal as untimely, when in fact the appeal was filed

within 180 days from the BCBSGA's initial denial of coverage, is a clear violation of ERISA

claim procedures regulation. To retain the benefit of a deferential standard BCBSGA would have

to show that rejecting Bryan's timely appeal was both inadvertent and harmless. *Halo*, 819 F.3d

at 58-59. (ERISA plan bears the burden of demonstrating that any claim procedure violation was

both inadvertent and harmless). There is no evidence in the record that BCBSGA carried its

burden of proof, and the Court should apply a *de novo* standard when reviewing the denial of coverage for Shannon's treatment.

II.    **MHPAEA REQUIRES COVERAGE FOR RESIDENTIAL TREATMENT BECAUSE THE PLAN COVERS ANALOGOUS LEVELS OF CARE FOR MEDICAL AND SURGICAL CONDITIONS**

    **A. Residential Treatment is a Well-Recognized Level of Necessary Care on the Continuum of Medically Necessary Services for the Treatment of Mental Disorders**

    Residential treatment is a level of sub-acute, non-hospital, inpatient care. *Harlick v. Blue Shield of California*, 686 F.3d 699, 709 (9th Cir. 2012). It is sometimes referred to as "intermediate" care. https://www.magellanprovider.com/media/1771/mnc.pdf, pp. v-vi (last viewed 9/05/17). It is often provided to adolescents who have mental illness or substance abuse problems that are not so severe as to require acute inpatient care, but are serious enough to require more than outpatient care. The average length of stay for adolescents is commonly from seven to twelve months. http://store.samhsa.gov/shin/content/SMA06-4167/SMA06-4167.pdf, p. 20, Table III.4 (last viewed 9/05/17). There is no question that residential treatment plays an important role as part of the spectrum of medically necessary levels of care in the treatment of mental, behavioral, and substance abuse disorders. *Harlick*, 686 F.3d at 709.

    **B. BCBSGA's Denial of Shannon's Residential Treatment Must be Reversed Because the Plan Applies Treatment Limitation to Mental Health Benefits Compared to Medical/Surgical Benefits.**

    The MHPAEA was designed by Congress to end discrimination in how ERISA plans provided health benefits for treatment of mental health and substance abuse relative to the benefits being provided by those plans for medical and surgical conditions. *American Psychiatric Association v. Anthem Health Plans*, 50 F.Supp.3d 157, 160 (D. Conn. 2014). Key to

accomplishing this purpose is prohibiting ERISA plans from imposing limitations on financial

requirements and treatment for mental health and substance use disorder conditions that were not

applied on a par with limitations for treatment of medical and surgical conditions. 29 U.S.C. §

1185a(a)(3).

This section of the MHPAEA states:

**(3) Financial requirements and treatment limitations---**
(A) In general.—In the case of a group health plan (or health
insurance offered in connection with such a plan) that provides both
medical and surgical benefits and mental health or substance use
disorder benefits, such plan or coverage shall ensure that—

(i)     the financial requirements applicable to such mental health or
substance use disorder benefits are no more restrictive than the
predominant financial requirements applied to substantially all
medical and surgical benefits covered by the plan (or coverage),
and there are no separate cost sharing requirements that are
applicable only with respect to mental health or substance use
disorder benefits; and
(ii)    the treatment limitations applicable to such mental health or
substance use disorder benefits are no more restrictive than the
predominant treatment limitations applied to substantially all
medical and surgical benefits covered by the plan (or coverage)
and there are no separate treatment limitations that are
applicable only with respect to mental health or substance use
disorder benefits.

(B) Definitions.—In this paragraph:

(i)     Financial requirement.—The term "financial requirement"
includes deductibles, copayments, coinsurance, and out-of-
pocket expenses, but excludes an aggregate lifetime limit and
an annual limit subject to paragraphs (1) and (2),
(ii)    Predominant.—A financial requirement or treatment limit is
considered to be predominant if it is the most common or
frequent of such tpe of limit or requirement.
(iii)   Treatment limitation.—The term "treatment limitation"
includes limits on the frequency of treatment, number of visits,
days of coverage, or other similar limits on the scope or
duration of treatment.

This language of MHPAEA requires that ERISA plans impose "treatment limitations" on mental health or substance abuse disorder benefits that are "no more restrictive" than the "predominant treatment limitations" applied to "substantially all medical and surgical benefits" and that there be no "separate treatment limitations that are applicable only with respect to mental health or substance abuse disorder benefits." 29 U.S.C. § 1185a(a)(3)(A)(ii). The Interim Final Rules ("IFR") and Final Rules were enacted to provide more detail and meaning to the MHPAEA requirements and cannot be interpreted in a way that violates the express statutory terms they were designed to help implement.

Subsection (3)(A)(i) of this section of the MHPAEA has been characterized as prohibiting "quantitative" limits on mental health and substance use disorder benefits that are more restrictive than those limits applicable to medical/surgical benefits while subsection (3)(A)(ii) has been characterized as prohibiting "nonquantitative" limits ("NQTL") on mental health and substance use disorder benefits that are more restrictive than those in place for medical/surgical benefits. See generally, 75 Fed. Reg. 5412-5417, the Preamble to the IFR. BCBSGA's exclusion of coverage for residential treatment in this case is an NQTL, not a quantitative treatment limit.

This language in the MHPAEA makes clear that the Plan's exclusion of coverage for residential treatment is a "treatment limitation" as that term is defined in 29 U.S.C. § 1185a(a)(3)(B)(iii). Excluding mental health coverage for residential treatment is a limit on the "scope" of that treatment as referenced in the definition of "treatment limitation" found in that section of the MHPAEA. *Joseph and Gail F.*, 158 F.Supp.3d at 1260-1261.

BCBSGA denied coverage for residential treatment Shannon received at Uinta from August 8, 2013 through November 12, 2015, arguing that residential treatment was "not a covered benefit based on the coverage as described in the [SPD]." BCBS 0010. July 21, 2014,

denial letter provides that"[t]his review is a benefit review and only addresses the necessity of the requested service as determined by the applicable provisions of the benefit plan." *Id*. Shannon received residential treatment in 2013, 2014 and 2015. The 2013 SPD provides that the Plan covers mental health treatment and "**may also include intensive outpatient/day treatment and possibly residential treatment**." BCBS 0140 (emphasis added). The 2014 SPD also describes benefits for mental health and substance abuse as covered services, including inpatient and outpatient. BCBS 0260. Both the 2013 and the 2014 SPD expressly exclude coverage for residential treatment centers unless they are "required to be covered by law." BCBS 0161, 0278. The 2015 SPD specifically provides coverage for residential treatment. BCBS 0374.

The wording of the Plan's exclusion of residential treatment in 2013 and 2014 serves as the Plan's acknowledgement of the possibility that the Plan was obligated to cover it. The Plan's exclusion was crafted in a way to avoid covering residential treatment, while at the same time, enable the Plan to have the second bite at the apple covering the possibility that the Plan was required by law to include such coverage. The Plan overlooks the fact that it was the Plan's primary responsibility to determine whether it was required by the law to include benefits for residential treatment and avoid drafting ambiguous and ineffective terms. The Plan violated the language of MHPAEA because the Plan provided coverage for skilled nursing facilities, sub-acute inpatient rehabilitation care, and sub-acute inpatient hospice treatment and did not provide coverage for residential treatment facilities. In evaluating whether the Plan provides benefits for mental health conditions at parity with the benefits provided for medical/surgical treatment, this Court is required to compare analogous levels of care. For the type of treatment at issue in this case, sub-acute (or intermediate) inpatient treatment, the analogous level of medical/surgical care to the mental health care provided in residential treatment facilities is treatment provided for sub-

acute inpatient settings such as for skilled nursing, rehabilitation or hospice care. *Harlick v. Blue Shield of California,* 686 F.3d 699, 716 (9th Cir. 2012). See also *Craft v. Health Care Services Corp.*, 84 F.Supp.3d 748, 754 (N.D. Ill. 2015) (referencing receiving medically necessary nursing care to rehabilitate a broken hip).

In *Joseph & Gail F.* the court was faced with the same issue this matter presents: whether the MHPAEA allowed an ERISA plan to exclude coverage of residential treatment of mental health conditions. *Joseph & Gail F.*, 158 F.Supp.3d at 1258-1262. *Joseph & Gail F.* held that "the clear and unambiguous language" of 29 U.S.C. §§ 1185a(a)(3)(A)(ii) and (a)(3)(B)(iii) prohibited an ERISA plan from excluding coverage for residential treatment where that plan provided coverage for skilled nursing facilities. 158 F.Supp.3d at 1262. The Plan provides coverage for skilled nursing facilities:

> Benefits are available when you require inpatient skilled nursing and related services for convalescent and rehabilitative care. The Facility or program must be licensed, certified or otherwise authorized, pursuant to the laws of the state in which it is situated, as a Skilled Nursing Facility. Benefits are not available for Custodial Care.

BCBS 0144, 0263.

The Plan violated the MHPAEA parity requirement when it excluded coverage for residential treatment, and provided coverage for skilled nursing facilities, rehabilitation, and hospice care. Each of these types of sub-acute (or intermediate) inpatient treatment settings for medical or surgical conditions is analogous to residential treatment for mental health or substance use disorders. Therefore, this Court must reverse BCBSGA's denial of coverage for Shannon's residential treatment.

//

//

### C. MHPAEA Requires the Plan to Cover Shannon's Residential Treatment under both the IFR and the Final Rules.

Shannon was admitted to Uinta on August 8, 2013. BCBS 0574. In 2013 the IFR issued by the Department of the Treasury, the Department of Labor and the Department of Health and Human Services issued on April 5, 2010, were still in place. The Summary of the IFR states that their intended purpose is "implementing the Paul Wellstone and Pete Domenici [MHPAEA] of 2008, which requires parity between mental health or substance abuse disorder benefits and medical/surgical benefits with respect to financial requirements and treatment limitations under group health plans." Federal Register/Vol. 78, 5410. The Final Rules that replaced the IFR and the mental health parity provisions of the Final Rules became applicable to group health plans on July 1, 2014. *Id*. at 68240.

Neither the IFR nor the Final Rules have the ability to countermand the requirements of the express, unambiguous terms of MHPAEA. *Chevron, U.S.A., Inc. v. NRDC, Inc*., 467 U.S. 837, 844 (1984). The MHPAEA's statutory requirements form the boundaries of what mental health benefits the Plan may exclude. *Id*. Nothing in the IFR and the Final Rules gives the Plan any basis or justification to exclude coverage for residential treatment while providing coverage for skilled nursing facilities, rehabilitation treatment or hospice care. Where regulatory interpretation is at odds with the plain language of the statute, courts "should avoid an interpretation of a statute that renders any part of it superfluous and does not give effect to all of the words used by Congress." *Nevada v. Watkins*, 939 F.2d 710, 715 (9th Cir. 1991). While the IFR did not specifically address the issue of "scope of services" or "continuum of care" and invited comments on those issues, the IFR recognized and acknowledged that "the MHPAEA prohibits plans and issuers from imposing treatment limitations on mental health and substance use disorder benefits that are more restrictive than those applied to medical/surgical benefits."

Federal Register, Vol. 75, 5416. But it is "implausible that the Departments' [of Labor, Treasury, and Health & Human Services] decision not to address the continuum of care issues in the IFRs was somehow an authorization for issuers to enforce treatment-setting limitations." *Craft v. Heath Care Services Corp.*, 2016 U.S. Dist. LEXIS 44810, *29-30 (N.D.Ill. 2016). The purpose of both the IFR and the Final Rules is to help implement the terms of the MHPAEA, not to impede the application of its unambiguous terms.

This Court has previously ruled that the IFRs do require ERISA plans to provide parity for residential treatment for mental health conditions with coverage for medical/surgical benefits. *Joseph & Gail F.* at 1260-1262. Other courts have ruled in the same manner. *Craft* at *29-30 ("The Court stands by its previous order and finds it implausible that the Departments' decision not to address the continuum of care issues in the IFRs was somehow an authorization for issuers to enforce treatment-setting limitations").

If there were any doubt about whether the IFR do not allow the Plan to exclude coverage for residential treatment, the question is put to rest by the prefatory comments for the Final Regulations:

> The Departments did not intend that plans and issuers could exclude intermediate levels of care [such as residential treatment] covered under the plan from MHPAEA's parity requirements. At the same time, the Departments did not intend to impose a benefit mandate through the parity requirement that could require *greater* benefits for mental health conditions and substance use disorders than for medical/surgical conditions. . . . Although the interim final regulations did not define the scope of the six classifications of benefits, they directed that plans and issuers assign mental health and substance use disorder benefits and medical/surgical benefits to these classifications in a consistent manner. This general rule also applies to intermediate services provided under the plan or coverage. Plans and issuers must assign covered intermediate mental health and substance use disorder benefits to the existing six benefit classifications in the same way that they assign comparable intermediate medical/surgical benefits to these classifications. For example, if a plan or issuer classifies care in skilled nursing facilities or rehabilitation hospitals as inpatient benefits, then the plan or issuer must likewise treat any covered care in

> residential treatment facilities for mental health or substance user disorders as
> an inpatient benefit (emphasis added).

78 Fed. Reg. at 68246-68247. This language confirms what is evident from the express terms of

the MHPAEA and a fair reading of the IFR.

Most of the Shannon's treatment, specifically during the period from July 1, 2014 through

November 12, 2015, was under the Final Rules. Indeed, the Plan contains language that obligates

it to provide coverage for Shannon's residential treatment and to comply with the parity

requirement of the MHPAEA for 2015. BCBSGA's denial of coverage for Shannon's treatment

was improper and should be reversed by this Court.

## III. BRYAN EXHAUSTED ALL ADMINISTRATIVE REMEDIES TO RECOVER BENEFITS UNDER THE PLAN BEFORE FILING THIS LAWSUIT.

When Bryan appealed BCBSGA's denial of coverage for Shannon's residential treatment on

December 29, 2014, he requested a thorough review of "Shannon's claims for the intermediate

residential treatment she is receiving at Uinta, for dates of service August 8, 2013 and going

forward, as she remains in treatment." BCBS 0007. The first page of the appeal letter references

that the appeal is for service dates provided from "August 8, 2014 – forward." In light of

BCBSGA's denial letter dated February 24, 2015, the reference to "2014" rather than "2013" is

clearly a typographical error. BCBS 0001. BCBSGA's denial letter issued in response to Bryan's

appeal acknowledges the request for an appeal of denial of coverage "for services performed on

August 8, 2013." BCBS 0041. BCBSGA's response to Bryan's appeal and its denial rationale

shows it understood that the August 8, 2014, reference as the service beginning date in Bryan's

appeal letter was a typographical error.

BCBSGA rejected Bryan's appeal stating, "a request for an appeal must be received within 180 days from the date you get an adverse decision. We didn't receive the request timely so it can't be reviewed." *Id*.

BCBSGA's assertion that Bryan's December 29, 2014, appeal was not received within 180 days from the date he received the adverse decision is patently wrong. BCBSGA's denial letter was dated July 21, 2014. BCBS 0010. Even if the denial letter was sent the same day it was created and Bryan also received it on the same day, his December 29, 2014, appeal was sent in a timely manner. Precisely, the appeal was sent 161 days after BCBSGA denied the coverage on July 21, 2014, and therefore the appeal was timely.

Bryan appealed BCBSGA's refusal to cover Shannon's treatment at Uinta and encompassed all services Shannon received during her entire treatment because when Bryan appealed the denial on December 29, 2014, Shannon was still in treatment. BCBS 0001. Correspondingly, the appeal letter identified the services being appealed as those provided from "August 8, 2014 [sic] – forward." *Id*.

BCBSGA reasoned in the initial denial of coverage for Shannon's treatment that "the requested service is not covered" benefit in the Plan. BCBS 0010. The final denial letter from March 16, 2015, BCBSGA upheld the denial on the same rationale. BCBS 0043. The final denial was issued in 2015, while Shannon was still in treatment, at the same time the 2015 SPD expressly provided that the Plan covers residential treatment.[1] BCBSGA inexplicably decided to focus on a single time frame of Shannon's treatment at Uinta, namely from August 8, 2013 through August 31, 2013, representing less than a month of the 27-month long treatment, while ignoring the rest of her claims in the appeal process. BCBS 0043. BCBSGA was on notice that

---

[1] The 2015 SPD characterizes residential treatment as a "specialized 24-hour treatment in a licensed Residential Treatment Center" offering treatment that includes observation, assessment by psychiatrist, rehabilitation, therapy and education. BCBS 0374.

Shannon was being continuously treated at Uinta because the claims for her treatment were regularly submitted, but chose to exclude it form the appeal process. BCBS 0467-0532. There was not justification for BCBSGA doing so.

The only reason for the denial of coverage BCBSGA asserted in its denial letters during the pre-litigation appeal process was the Plan's exclusion of coverage for residential treatment. The Plan is therefore precluded from asserting any other rationale in litigation. It is well established under Tenth Circuit precedent that ERISA plan administrators may not rely for the first time in litigation on evidence or facts that were not presented in the pre-litigation claim and appeal process. *Spradley v. The Owens-Illinois Hourly Employees Welfare Benefit Plan*, 686 F.3d 1135, 1140-1141 (10th Cir. 2012); *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co*., 491 F.3d 1180, 1190-1191 (10th Cir. 2007). BCBSGA may attempt to raise in litigation other reasons it asserts justify denying Shannon's treatment at Uinta. But Tenth Circuit case law is clear and prevents Bryan being sandbagged by BCBSGA in this manner. *Flinders* at 1190 (citing *Sandoval v. Aetna Life and Cas. Ins. Co.*, 967 F.2d 377, 380 (10th Cir. 1992)); *see also King v. Hartford Life and Accident Ins. Co.*, 414 F.3d 994, 999 (8th Cir. 2005) ("[A] reviewing court must focus on the evidence available to the plan administrators at the time of their decision and may not admit new evidence or consider *post hoc* rationales.").

The Plan's description of the appeal process does not specify how many appeals the Plan requires to exhaust administrative remedies offered by the Plan. BCBS 0176, 0294, 0409. The Plan only provides that a member can file a written complaint, which "may involve your dissatisfaction with our administration or claim practices…a determination…or denial of a claim that you think should be paid by us." *Id.*

In the final denial letter dated March 16, 2015, BCBSGA informed Bryan that he had "exhausted all mandatory grievance rights, [and that he has] the right to bring a civil action in federal court under section 502(a)(1)(B) of ERISA." BCBS 0043. The letter also informed Bryan that he has the option to file a voluntary second appeal. BCBS 0045. Considering that BCBSGA denied coverage arguing that it was not a covered benefit under the Plan, there was zero likelihood that BCBSGA would decide any differently in the second appeal.

Bryan exhausted all administrative remedies available under the Plan and should be held harmless from BCBSGA's failure to consider in the appeal all the claims for Shannon's treatment. Bryan used due diligence to exercise his rights under the Plan by filing a timely appeal. Bryan did everything the Plan required him to do in the appeal process.

## IV.  BRYAN IS ENTITLED TO AN AWARD OF PREJUDGMENT INTEREST AND ATTORNEY FEES AND COSTS

### A. Bryan is Entitled to an Award of Prejudgment Interest

It is well established in the Tenth Circuit that an award of prejudgment interest is appropriate in ERISA cases where state statutes provide for such payment. *Allison v. BankOne-Denver*, 289 F.3d 1223, 1243-44 (10th Cir. 2002); *Caldwell v. Life Insurance Company of North America*, 287 F.3d 1276, 1286-87 (10th Cir. 2002). The Tenth Circuit has affirmed an award of prejudgment interest in an ERISA case as high as 15%. *Weber*, 541 F.3d at 1016. The award of prejudgment interest rests in the discretion of the trial court. *Id.* However, it is properly awarded as part of the compensation contemplated under ERISA. *Id*; *Allison*, 289 F.3d at 1243.

In Utah, prejudgment interest on denied insurance claims "represents an amount awarded as damages due to the opposing party's delay in tendering the amount owing under an obligation." *Castillo v. Atlanta Casualty Company*, 939 P.2d 1204, 1212 (Utah App. 1997). Prejudgment interest not only compensates a party for the time value of money withheld from it, it deters

intentional witholding of money owed. *Trail Mountain Coal Company v. Utah Division of State Lands and Forestry*, 921 P.2d 1365, 1370 (Utah 1996), *cert. den.* 519 U.S. 1142 (1997). U.C.A. § 15-1-1(2) states that: "Unless parties to a lawful contract specify a different rate of interest, the legal rate of interest for the loan or forbearance of any money, goods, or chose in action shall be 10% *per annum*."

Under the facts of this case, the Court should award interest at 10% as called for under U.C.A. §15-1-1. ERISA provides for no remedy in the nature of extra-contractual or consequential damages to compensate Bryan for the fact that he has suffered significant financial hardship in being required to pay out of pocket for the treatment that the Plan was obligated to provide. Bryan should be awarded the full amount of prejudgment interest allowed under U.C.A. §15-1-1. This is appropriate not only to compensate her for the loss of use of the funds but as a small measure of equitable disgorgement from the Plan to reflect the fact that it has wrongfully received the benefit of these insurance proceeds since it denied Shannon's claim.

**B. An Award of Attorney Fees and Costs Pursuant to 29 U.S.C. §1132(g) is Appropriate in This Case**

Bryan's counsel, Brian S. King ("King"), has kept a record of his time and the time of his paralegal throughout the case. While Bryan retained King on a contingent fee arrangement, courts generally rely on a lodestar method for awarding fees in individual ERISA benefit recovery cases. King may also recover certain out-of-pocket expenses as outlined in 28 U.S.C. §1920 and designated as taxable costs. Those taxable costs include filing fees, constables' service fees and photocopies of file materials required in moving the case forward.

*Hardt v. Reliance Standard Life Ins. Co.*, 130 S.Ct. 2149 (2010), discussed an award of attorney fees in the context of ERISA. In *Hardt*, the trial court evaluated the request for fees under a three-step framework: is the requesting party a prevailing party; if so, is an award of fees

appropriate; and if so, are the fees requested reasonable? In *Hardt*, the trial court awarded fees

and the Second Circuit reversed the award on the basis that a remand was not sufficient to make

Hardt a "prevailing party." The Supreme Court held that in ERISA cases, 29 U.S.C. §1132(g)(1)

does not require a party to be a prevailing party in order to obtain an award of attorney fees. *Id.*,

130 S.Ct. at 2156. Rather, the Supreme Court ruled that if a claimant demonstrated "some degree

of success on the merits," they would be entitled to an award of fees in the discretion of the

court. *Id.*, 130 S.Ct. at 2158.

The Supreme Court also discussed the application of the well accepted "five factor" test to

determine whether or not an award of fees is appropriate. *Hardt* states:

> Because these five factors bear no obvious relation to §1132(g)(1)'s text
> or to our fee-shifting jurisprudence, they are not required for channeling a
> court's discretion when awarding fees under this section.

*Id.*, 130 S.Ct. at 2158. However, the Supreme Court did not completely rule out the use of the

five factors as a way of assisting courts in their discretionary decision-making regarding an

award of attorney fees. *Id.*, at fn. 8.

The Tenth Circuit restates the non-exclusive five factors in *DeBoard v. Sunshine Mining &*

*Refining Co.*, 208 F.3d 1228, 1244 (10th Cir. 2000):

> In deciding whether to exercise its discretion and award fees, a district court should
> consider the following nonexclusive list of factors:
>
> 1. the degree of the offending party's culpability or bad faith;
> 2. the degree of the ability of the offending party to satisfy an award of attorney's fees;
> 3. whether or not an award of attorney's fees against the offending party would deter other
>    persons acting under similar circumstances;
> 4. the amount of the benefit conferred on members of the plan as a whole; and
> 5. the relative merits of the parties' positions.

In weighing these factors, an award of attorney fees in this case is appropriate. As for the

first and fifth factors, BCBSGA, as agent for the Plan, and the Plan acted culpably or in bad faith

by refusing to pay Shannon's benefits, by failing to fulfill its fiduciary role and act in Shannon's behalf, by failing to include coverage for residential treatment.

With regard to the second factor, the Plan is sponsored and funded by a multibillion dollar company and is certainly in a position to pay any award of attorney fees this Court assesses. With regard to the third factor, whether or not an award of attorney fees against the Plan would deter other persons acting under similar circumstances, as noted by this Court in another recent ERISA case, ". . . the court finds that an award of attorney fees would indeed deter others acting under similar circumstances." *James F. et al. v. CIGNA Behavioral Health*, 2011 U.S. Dist. LEXIS 64009, *5 (D. Utah 2011)(Kimball, J.) (citations omitted).

When an ERISA plaintiff is successful in getting a wrongful denial of benefits reversed, an award of attorney fees sends a strong message to insurers and plans that payment of benefits which plan participants have contracted and paid for and have reasonable expectations of receiving cannot be avoided by self-serving parsing of plan terms. In *Ray v. UNUM Life Insurance Company of America*, 224 Fed. Appx. 772; 2007 U.S. App. LEXIS 7234 (10th Cir. 2007), the Tenth Circuit reviewed a district court's award of attorney fees to a prevailing plaintiff. In that case, the court found that the insurer's review of the plaintiff's claim was in bad faith and ". . . an award of attorney fees should deter such conduct in the future . . . ." *Id*, at 788. Conversely, the failure to award attorney fees will make it clear to BCBSGA, the Plan, and others that, even in the event that a court later finds their denials without merit, they have little to fear (and the use of the funds during the appeal and litigation to gain) by attempting to deny legitimate claims, acting in a self-interested manner, and seeing if they can get away with it.

With regard to the fourth factor, reminding BCBSGA and the Plan that selective and self-serving decisions will not be permitted may very well have the indirect effect of making sure that

future participants and beneficiaries obtain the benefits to which they are entitled under their policies.

It is within the Court's discretion to award prejudgment interest pursuant to U.C.A. §15- 1- 1, attorney fees based on the hourly charges of King and his paralegal and to award costs pursuant to the provisions of 28 U.S.C. §1920. The Plaintiffs request that the Court award prejudgment interest and allow King to submit an Affidavit with an accounting of the time and costs in connection with an award of attorney fees.

DATED this 18th day of September 2017.

s/ Brian S. King
Brian S. King
Attorney for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document has been delivered via the Court's electronic filing and case management system to the following:

DATED this 18th day of September 2017.

s/ Linda Bosen