This is a redacted version of a sealed order filed January 18, 2018, as docket no. 60.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| B.D. and S.D.,<br><br>                Plaintiffs,<br><br>v.<br><br>BLUE CROSS BLUE SHIELD OF GEORGIA, and ATLANCO VENTURES, INC. MEDICAL BENEFIT PLAN,<br><br>                Defendants. | **REDACTED MEMORANDUM DECISION AND ORDER**<br>- **GRANTING [39] MOTION FOR SUMMARY JUDGMENT;**<br>- **DENYING [41] MOTION FOR SUMMARY JUDGMENT; and**<br>- **AWARDING BENEFITS**<br><br>Case No. 1:16-cv-00099-DN<br><br>District Judge David Nuffer |

This administrative appeal of Defendants' Blue Cross Blue Shield of Georgia ("BCBSG") denial of benefits for Plaintiffs B.D. and S.D. is governed by ERISA.[1] Plaintiffs sued Defendants, after Plaintiff S.D.'s residential treatment for mental health related issues was denied by BCBSG. BCBSG insures Atlanco Ventures, Inc. Medical Benefit Plan ("Plan"). Atlanco Ventures, Inc. was dismissed.[2] Plaintiffs and BCBSG move for summary judgment.[3] Each party opposes the other's motion and replies in support of its motion.[4]

---

[1] The Employee Retirement Income Security Act of 1974.

[2] Order Granting Stipulated Motion to Dismiss Defendant Atlanco Ventures, Inc. Medical Benefits Plan Without Prejudice, docket no. 44, filed September 25, 2017.

[3] Plaintiffs' Motion for Summary Judgment and Memorandum in Support ("Plaintiffs' Motion"), docket no. 39, filed September 18, 2017. Defendant Blue Cross and Blue Shield of Georgia, Inc.'s Motion for Summary Judgment and Supporting Memorandum ("Defendants' Motion"), docket no. 41, filed September 18, 2017.

[4] Defendant Blue Cross and Blue Shield of Georgia, Inc.'s Memorandum in Opposition to Plaintiffs' Motion for Summary Judgement ("Defendant's Opposition"), docket no. 47, filed October 6, 2017; Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Plaintiffs' Opposition"), docket no. 48, filed October 6, 2017; Reply Memorandum in Further Support of Defendant Blue Cross and Blue Shield of Georgia, Inc.'s Motion for Summary Judgment ("Defendant's Reply"), docket no. 54, filed October 23, 2017; Plaintiffs' Reply in Support of Motion For Summary Judgment ("Plaintiffs' Reply"), docket no. 55, filed October 23, 2017.

Plaintiff B.D. is a participant in the Plan and his daughter S.D. is a beneficiary of the Plan. S.D. received mental health care and treatment at Uinta Academy ("Uinta") in Utah between August 8, 2013, and November 12, 2015. Uinta requested approval for coverage of services provided from August 8, 2013 through July 17, 2014, and BCBSG initially denied coverage, indicating the requested services were not a covered benefit. B.D. administratively appealed. BCBSG upheld its previous decision. B.D. sued.

The Plan changed year-to-year and there was a separate plan document ("SPD") for each of the 2013, 2014 and 2015 years. For 2013 and 2014, the Plan did not list residential treatment centers as a covered benefit, "Residential Treatment Centers [are not covered] Unless required to be covered by law."[5] In 2015, the Plan changed to cover residential treatment centers for mental health services.

A.    Background .................................................................................................... 3
      1.    The Parity Act ..................................................................................... 3
      2.    The Interim Final Rules. ..................................................................... 4
      3.    The Final Rules. ................................................................................. 6
B.    Undisputed material facts ............................................................................. 7
      1.    The Plan. ............................................................................................ 8
      2.    BCBSG's Denial of Benefits for S.D.'s Stay at Uinta......................... 10
C.    Summary Judgment Standard ..................................................................... 13
D.    Discussion .................................................................................................. 14
      1.    Benefits Incurred Before January 1, 2015. .................................... 14
            a.    Standard of Review............................................................. 14
            b.    The Plan did not violate the Parity Act. BCBSG's interpretation of the Plan violated the Parity Act. ......................................................... 15
      2.    Benefits Incurred on or After January 1, 2015. .............................. 20
            a.    Standard of Review............................................................. 20
            b.    B.D. exhausted administrative remedies.............................. 21
      3. Remand is inappropriate. ..................................................................... 23
      4.    Prejudgment interest and attorney's fees and costs. ........................ 25
E.    Order ......................................................................................................... 27

---

[5] Defendant's Opposition at BCBS 0161. The 2014 SPD has a slight variation of this language, "Residential Treatment Centers Unless we must cover them by law." Defendant's Motion at BCBS 0278.

## A. BACKGROUND

### 1. The Parity Act

The Mental Health Parity Act of 1996 ("MHPA") requires group health plans to use the same aggregate lifetime and annual dollar limits for mental health benefits that the plans impose on medical/surgical benefits. In 2008, the Paul Wellstone and Pete Domenici Mental Health and Addiction Equity Act ("Parity Act") sought to achieve parity by mandating equal treatment limitations placed on mental health and medical/surgical benefits.[6] Under the Parity Act, a plan must ensure that (1) the treatment limitations applicable to mental health benefits are "no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan; and (2) "there are no separate treatment limitations that are applicable only with respect to [mental health benefits]."[7] The Parity Act defines "treatment limitation" by referring to the scope and duration of treatment. "Specifically, treatment limitation 'includes limits on the frequency of treatment, number of visits, days of coverage, or other similar limits on the scope or duration of treatment.'"[8]

Congress delegated to the Department of Labor, the Department of Health and Human Services, and the Department of Treasury ("Departments") to issue "guidance and information" on the Parity Act's requirements.[9] "Congress directed, however, that the Parity Act would apply to all plans beginning on or after October 3, 2009, and Congress did not provide for a delay of the Parity Act even if the Departments had not yet issued the rules."[10]

---

[6] 29 U.S.C. § 1185(a)(3)(A)(i)-(iii); see *Craft v. Health Care Serv. Corp.*, 84 F. Supp. 3d 748 (N.D. Ill. 2015).

[7] *Id.*

[8] *Natalie V. v. Health Care Serv. Crop.*, 2016 U.S. Dist. LEXIS 123783, at *6 (N.D. Ill. 2016), Case No. 1:15-cv-09174, docket no. 27, (quoting 29 U.S.C. § 1185a(a)(3)(B)(iii)).

[9] 29 U.S.C. § 1185a(g).

[10] *Natalie V.* 2016 U.S. Dist. LEXIS 123783, at *6-*7 (citing Pub. L. No. 110-343, 122 Stat. 3891 (2008) (codified as 42 U.S.C. § 300gg–5) ("The amendments made by this section shall apply with respect to group health plans for

## 2. The Interim Final Rules.

The Interim Final Rules ("IFR") were implemented on an expedited basis without comments in February 2010, just four months after the Parity Act took effect, and remained in effect until the Final Rules were published in 2014.[11] The IFRs required treatment limitation parity between mental health benefits and medical benefits which are applied on a classification-by-classification basis.[12] The IFRs "established six 'classifications of benefits' for purposes of Parity Act compliance: (1) inpatient, in-network; (2) inpatient, out-of-network; (3) outpatient, in-network; (4) outpatient, out-of-network; (5) emergency care; and (6) prescription drugs."[13] "The Departments chose these classifications after observing that many plans already varied treatment limitations 'based on whether a treatment is provided on an inpatient, outpatient, or emergency basis; whether a provider is a member of the plan's network; or whether the benefit is specifically for a prescription drug.'"[14] "The regulations left it to group health plans to define, for example, 'inpatient, outpatient, and emergency care,' but mandated that plans apply those terms 'uniformly' for both mental health and medical/surgical benefits."[15]

Under the IFRs, group health plans were required to "provide the same treatment limitations for mental health and medical/surgical benefits within each classification…"[16] As a

---

plan years beginning after the date that is 1 year after the date of enactment of this Act [October 3, 2008] …."); *see also* Preamble, Interim Final Rules Under the Parity Act, 75 Fed. Reg. 5410-01, 5411 (Feb. 2, 2010) ("The changes made by [the Parity Act] are generally effective for plan years beginning after October 3, 2009."); 29 C.F.R. § 2590.712 (amended Jan. 13, 2014)).

[11] *Natalie V.,* 2016 U.S. Dist. LEXIS 123783, at *7 (citing Preamble, IFRs, 75 Fed. Reg. 5410-01; 29 C.F.R. § 2590.712).

[12] *Id.* at *8 (citing Preamble, IFRs, 75 Fed. Reg. at 5412).

[13] *Id*. (citing 29 C.F.R. § 2590.712(c)(1)(i)-(ii)).

[14] *Id*. (quoting Preamble, IFRs, 75 Fed. Reg. at 5413).

[15] *Id*.

[16] *Natalie V.,* 2016 U.S. Dist. LEXIS 123783, at *8 (citing 29 C.F.R. § 2590.712(c)(2)(ii)(A); Preamble, IFRs, 75 Fed. Reg. at 5413).

result, a group health plan, in each classification, "could not place a treatment limitation on mental health benefits that was more restrictive than the treatment limitation applied to medical/surgical benefits in that same classification."[17] "And, if a plan provided any benefits for a mental illness, the group health plan had to provide mental health benefits in each classification for which it provided any medical/surgical benefits."[18] "The six classifications generally applied to both 'quantitative' and 'nonquantitative limitations.'"[19] "A quantitative treatment limitation, as defined under the IFRs, is a limitation that is 'expressed numerically (such as 50 outpatient visits per year) . . . . .'"[20] "By contrast, a nonquantitative treatment limitation is a limitation that 'otherwise limits the scope or duration of benefits for treatment …'"[21] (such as preauthorization requirements). The IFRs developed a standard for analyzing nonquantitative treatment limitations:

> A group health plan (or health insurance coverage) may not impose a nonquantitative treatment limitation with respect to mental health or substance use disorder benefits in any classification unless, under the terms of the plan (or health insurance coverage) as written and in operation, any processes, strategies, evidentiary standards, or other factors used in applying the nonquantitative treatment limitation to mental health or substance use disorder benefits in the classification are comparable to, and are applied no more stringently than, the processes, strategies, evidentiary standards, or other factors used in applying the limitation with respect to medical/surgical benefits in the classification.[22]

In other words, under the IFRs, a plan complied with the Parity Act if, "when applying treatment limitations to all benefits in a group health plan," the insurance "company used

---

[17] *Id*. at 9.

[18] *Id*.

[19] *Id*. (citing 29 C.F.R. § 2590.712(c)(4)(ii)).

[20] *Id*. (quoting 29 C.F.R. § 2590.712(a); *see also* Preamble, IFRs, 75 Fed. Reg. at 5412).

[21] *Id*.

[22] 29 C.F.R. § 2590.712(c)(4)(i).

comparable processes, strategies, evidentiary standards, or other factors."[23] "The 'processes, strategies, evidentiary standards, or other factors' could not just be comparable 'on their face'; rather, the group health plan had to apply them 'in the same manner.'"[24]

"Although the Departments provided much needed guidance on 'nonquantitative treatment limitations' in the IFRs, they left one major issue unaddressed: the extent to which the Parity Act required that the 'scope of services' that a plan offered for mental health conditions had to be on par with those offered for medical/surgical conditions."[25] "The term 'scope of services' 'generally refers to the types of treatment and treatment settings that are covered by a group health plan or health insurance coverage.'"[26] "Though the Departments acknowledged that 'not all treatments or treatment settings for mental health … correspond to those for medical/surgical conditions,' they made clear that the IFRs did not address the scope of services issue and 'invite[d] comments on whether and to what extent [the Parity Act] addresses the scope of services … provided by a group health plan…'"[27]

### 3. The Final Rules.

The Final Rules were published on November 13, 2013, and the mental health parity provisions of the final regulations applied to group health plans for plan years beginning on or after July 1, 2014.[28] "The Final Rules also addressed the 'scope of services' issue—that is, the types of treatment or treatment settings that plans offer within each…classification."[29] The final

---

[23] *Natalie V.*, 2016 U.S. Dist. LEXIS 123783, at *10 (citing 29 C.F.R. § 2590.712(c)(4)(i); Preamble, IFRs, 75 Fed. Reg. at 5416).

[24] *Id*.

[25] *Id*. at *10-11.

[26] *Id*. (quoting Preamble, Final Rules, 78 Fed. Reg. at 68246).

[27] *Id.* (quoting Preamble, IFRs, 75 Fed. Reg. at 5416-17).

[28] Preamble, Final Rules Under the Parity Act, 78 Fed. Reg. 68240 (Nov. 13, 2013); 29 C.F.R. § 2590.712(i).

[29] *Natalie V.*, 2016 U.S. Dist. LEXIS 123783, at *13.

regulations clarified that "plan or coverage restrictions based on geographic location, *facility type*, provider specialty, and other criteria that limit the scope or duration of benefits for services must comply with the nonquantitative treatment limitation parity standard."[30] Therefore, residential treatment or intensive outpatient treatment—"intermediate" services — "were subject to the Act's parity requirements."[31]

The Final Rules "confirmed that skilled nursing facilities are the medical/surgical 'scope of services' analogue for residential mental health treatment centers:

> Plans and issuers must assign covered intermediate mental health …disorder benefits to the existing six benefit classifications in the same way that they assign comparable intermediate medical/surgical benefits to these classifications. For example, if a plan or issuer classifies care in skilled nursing facilities or rehabilitation hospitals as inpatient benefits, then the plan or issuer must likewise treat any covered care in residential treatment facilities for mental health … disorders as an inpatient benefit."[32]

"The Final Rules made clear that plan restrictions based on types of treatment or treatment settings—like residential treatment centers—must comply with the nonquantitative treatment limitation parity standard."[33]

## B. UNDISPUTED MATERIAL FACTS

The following Undisputed Material Facts are taken from both Plaintiffs' Motion and Defendant's Motion.

---

[30] *Natalie V.*, 2016 U.S. Dist. LEXIS 123783, at *13 (citing 29 C.F.R. § 2590.712(c)(4)(ii) (emphasis added)).

[31] *Natalie V.*, 2016 U.S. Dist. LEXIS 123783, at *13 (citing Preamble, Final Rules, 78 Fed. Reg. at 68246).

[32] *Natalie V.*, 2016 U.S. Dist. LEXIS 123783, at *14 (quoting Preamble, Final Rules, 78 Fed. Reg. at 68247; 78 Fed. Reg. at 68273 (Example 9 illustrates why categorically excluding coverage for residential mental health treatment when covering comparable treatment settings for medical/surgical conditions violates the Parity Act)).

[33] *Natalie V.* at *14-*15 (citing 29 C.F.R. § 2590.712(c)(4); Preamble, Final Rules, 78 Fed. Reg. at 68246-47).

## 1. The Plan.

1.  The 2013, the 2014 and the 2015 SPDs under the respective "Notices" sections describe the Mental Health Parity and Addiction Act:

> The Parity Act provides for parity in the application of aggregate treatment limitations (day or visit limits) on mental health and substance abuse benefits with dollar limits or day/visit limits on medical/surgical benefits. In general, group health plans offering mental health and substance abuse benefits cannot set day/visit limits on mental health or substance abuse benefits that are lower than any such day or visit limits for medical and surgical benefits. A plan that does not impose day or visit limits on medical and surgical benefits may not impose such day or visit limits on mental health and substance abuse benefits offered under the Plan.

2.  The 2013 SPD provides that the Plan covers the following mental health and substance abuse services: "Treatment generally involves inpatient and outpatient services and may also include intensive outpatient/day treatment and possibly residential treatment centers."

3.  The 2014 SPD provides that the covered services for mental health and substance abuse treatment include:

> Inpatient Services in a Hospital or any Facility that we must cover per state law. Inpatient benefits include psychotherapy, psychological testing, convulsive therapy, detoxification, and rehabilitation. Outpatient Services including treatment in an outpatient department of a Hospital and office visits. Day Treatment Services which are services more intensive than outpatient visits but less intensive than an overnight stay in the Hospital.

4.  In the 2013 SPD under the "What's Not Covered" section it lists "Residential Treatment Centers Unless required to be covered by law." [34]

---

[34] Defendant's Opposition at BCBS 0161.

5.   In the "What's Not Covered Section," the 2014 SPD lists "Residential Treatment Centers Unless we must cover them by law."[35]

6.   The 2013 and the 2014 SPDs provided coverage for skilled nursing facilities.

7.   The 2013 and the 2014 SPDs covered rehabilitation services.

8.   The 2013 and the 2014 SPDs provided coverage for hospice care.

9.   The Plan, effective January 1, 2015, changed so that residential treatment centers providing care for mental health were a covered benefit provided that the treatment was medically necessary. In the section providing what services are covered, the 2015 SPDs states:

> Inpatient Services in a Hospital or any Facility that we must cover per state law. Inpatient benefits include psychotherapy, psychological testing, electroconvulsive therapy, and detoxification. Outpatient Services including office and treatment in an outpatient department of a Hospital or outpatient Facility, such as partial hospitalization programs and intensive outpatient programs. Residential Treatment which is specialized 24-hour treatment in a licensed Residential Treatment Center. It offers individualized and intensive treatment and includes: Observation and assessment by a physiatrist weekly or more often, Rehabilitation, therapy, and education.

10.  The 2013, 2014 and 2015 SPDs General Provisions sections provide: "Any [provision] of the Plan which is in conflict with the laws of the state in which the Group Contract is issued, or with federal law, will hereby be automatically amended to conform with the minimum requirements of such laws."

11.  The 2013, the 2014 and the 2015 SPDs define medical necessity as follows: "BCBSG reserves the right to determine whether a service or supply is Medically Necessary.

---

[35] Defendant's Opposition at BCBS 0278.

The fact that a [physician] has prescribed, ordered, recommended or approved a service or supply does not, in itself, make it Medically Necessary."

12. The Plan requires that medical providers, on behalf of the plan participants, seek authorization from BCBSG prior to obtaining certain services.

In summary, the Plan for 2013 and 2014 provided coverage for medical treatment at a skilled nursing facilities, rehabilitation services and hospice care and excluded coverage for mental health services at a residential treatment facility, unless it was required by law. Under the "What's Not Covered" Section of the SPDs, it states "In this section you will find a summary of items that are not covered by your Plan. Excluded items will not be covered even if the service, supply or equipment would otherwise be considered Medically Necessary."[36] In the list of what is not covered, the 2013 and 2014 SPDs state "Residential Treatment Centers Unless required to be covered by law."[37] Beginning January 1, 2015, the Plan changed and provided coverage for mental health services at residential treatment centers.

## 2. BCBSG's Denial of Benefits for S.D.'s Stay at Uinta.

1. In the event that a plan participant seeks review of BCBSG's denial of benefits for a claim, the participant can appeal BCBSG's denial as set forth in the Plan.

2. The 2013, 2014 and 2015 SPDs provide that members can file a Grievance, which is a written complaint regarding the services or benefits received from the Plan. "The complaint may involve your dissatisfaction with our administration or claim practices, disenrollment proceedings, a determination of a diagnosis or level of service or denial of a claim that you think should be paid by us."

---

[36] Defendant's Motion at BCBS 0157 and 0275.

[37] *Id*. at BCBS 0161. The 2014 SPD has a slight variation of this language, "Residential Treatment Centers Unless we must cover them by law." Defendant's Motion at BCBS 0278.

3.     The Plan's appeal process is described under the "Grievance and External Review Procedures" section in the 2013, the 2014 and the 2015 SPDs but there is neither information about any external review procedures nor specifics about the number of appeals allowed.

4.     According to Uinta's Master Treatment Plan, S.D. struggled with depression, anxiety, and behavioral issues before she was admitted for treatment at Uinta.

5.     S.D. was admitted at Uinta on August 8, 2013, when she was 15 years old.

6.     After she was admitted to Uinta, S.D. was diagnosed with: Depressive Disorder NOS, Anxiety Disorder NOS, Reactive Attachment Disorder of Infancy or Early Childhood, Learning Disorder NOS, Problems with Primary Support Group, and Problems Related to the Social Environment Educational Problems.

7.     S.D.'s treatment at Uinta included individual, group and family therapy sessions.

8.     S.D. was discharged from Uinta on November 12, 2015.

9.     In July of 2014, while S.D. was still being treated at Uinta, Uinta requested approval for coverage of services provided from August 8, 2013 through July 17, 2014.

10.    On July 21, 2014, BCBSG denied coverage for the stated services based on the following rationale:

> A request for payment for Child/Adolescent Psychiatric Residential Treatment has been received and administratively denied. Our records indicate that the requested service is not covered benefit based on the coverage as described in the [SPD]. Specifically, the Level of Care requested is not a covered benefit under the member's contract.

11.    On December 29, 2014, B.D. appealed the denial of coverage for S.D.'s treatment at Uinta disagreeing with BCBSG finding "that the multidisciplinary residential treatment services [S.D.] is receiving are not a covered benefit under [the] plan."

12.    To support his argument that residential treatment coverage was not excluded by the Plan, B.D. argued that BCBSG relied on the exclusion in the Plan, which provide that residential treatment is not covered benefit "[u]nless required to be covered by law."

13.    B.D. argued that coverage for residential treatment was required by the Parity Act and the Patient Protection and Affordable Care Act ("PPACA") of 2010, and cited to the "Conformity with Law" language in the Plan that stated "[a]ny provision of the Plan which is in conflict with the laws of the state...or with federal law, will hereby be automatically amended to conform with the minimum requirements of such laws."

14.    B.D. also included in his December 29, 2014 appeal relevant provisions of the Parity Act, PPACA and comments on the Final Rules arguing that "[w]hile the Parity Act does not require the health plans to cover mental health services, if a plan does cover mental health services (and this Plan does), such coverage must be provided at 'parity' with medical/surgical benefits provided under the plan."

15.    B.D. requested "a full, fair and thorough [review] of [S.D.]'s claims for the intermediate residential treatment she [was] receiving at Uinta for dates of service August 8, 2013, and going forward."[38]

16.    B.D.'s appeal, on December 29, 2014, was the only appeal filed.

17.    On February 24, 2015, BCBSG responded to B.D.'s appeal. It declined to consider B.D.'s request for coverage arguing that the appeal was untimely because it was not received "within 180 days from the date you [got the] adverse decision."

---

[38] On the first page of B.D.'s December 29, 2014, Appeal Letter, it indicates that the dates of service were "08/08/2014-forward." The reference to 2014 appears to be a typographical error because later in the letter, B.D. states he is requesting an appeal "for dates of service August 8, 2013 and going forward..." *See* Defendant's Motion at BCBS 0001-0007.

18.     BCBSG's initial denial of coverage was issued on July 21, 2014. B.D. appealed the denial on December 29, 2014, within 180 days from the receipt of the initial denial of coverage.

19.     On March 16, 2015 BCBSG reviewed the appeal and upheld the denial, stating "According to the 'What's Not Covered' section in your SPD, residential treatment centers are not covered, unless required by law. While these services may be beneficial to the member, the benefit contract overrides the medical necessity in this issue."

20.     BCBSG's March 16, 2015 final denial letter stated: "If your health benefit plan is subject to the Employee Retirement Income Security Act of 1974 (ERISA), and you have exhausted all mandatory grievance rights, you have the right to bring a civil action in federal court under section 502(a)(1)(B) of ERISA."

21.     The final denial letter also provided that a "voluntary second level appeal" is available as well as "[i]ndependent external review...if our decision was based on medical judgment as provided by the Patient Protection and Affordable Care Act (PPACA)."

22.     From the beginning of S.D.'s treatment at Uinta on August 8, 2013 through November 12, 2015 when she was discharged, claims for the services provided were submitted to BCBSG, all of which were denied.

## C.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[39] A factual dispute is genuine when "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[40] In

---

[39] Fed. R. Civ. P. 56(a).

[40] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

determining whether there is a genuine dispute as to material fact, the court should "view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant."[41]

The moving party "bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law."[42]

## D. DISCUSSION

The parties' arguments will be addressed in two separate categories: (1) benefits incurred before January 1, 2015, when the IFRs were in effect, and (2) benefits incurred on or after January 1, 2015, when the Final Rules became effective for the Plan.

### 1. Benefits Incurred Before January 1, 2015.

B.D. urges the reversal of BCBSG's denial of pre-January 1, 2015 benefits because the Plan's exclusion of coverage for residential treatment violated the Parity Act. Before discussing B.D.'s argument, the applicable ERISA standard of review will be discussed.

#### a. Standard of Review.

Under 29 U.S.C. § 1132(a)(1)(B)[43] a civil action may be brought by a participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." When a participant or beneficiary brings an action under Section 1132(a)(1)(B), the court reviews the denial of benefits "under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[44] "Where the plan gives the administrator discretionary authority

---

[41] *Id.*

[42] *Id.* at 670-71.

[43] The codification of ERISA Section 502(a)(1)(B).

[44] *Eugene S. v. Horizon Blue Cross Blue Shield of New Jersey*, 663 F.3d 1124, 1130 (10th Cir. 2011) (internal alterations and quotation marks omitted).

. . . [the court] employ[s] a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious."[45]

The Plan gives BCBSG discretionary authority to determine eligibility of benefits and BCBSG's denial of benefits would be reviewed under an arbitrary and capricious standard.[46] However, because B.D. argues that the Plan violated the Parity Act for benefits incurred before January 1, 2015, the issue is statutory interpretation, and as such, BCBSG is owed no deference to its discretionary authority.[47] The interpretation of the Parity Act is a question of law subject to de novo review. The parties agree that this is the appropriate standard of review for the benefits incurred before January 1, 2015.[48]

      **b. The Plan did not violate the Parity Act. BCBSG's interpretation of the Plan violated the Parity Act.**

B.D. contends that the plain language of the Parity Act required the Plan to cover S.D.'s treatment at Uinta. Additionally, B.D. argues that the Plan violated the Parity Act because it included coverage for skilled nursing facilities and other sub-acute inpatient facilities and excluded benefits for mental health services at residential treatment centers, which are analogous levels of care for medical surgical benefits.

BCBSG maintains that the Parity Act itself does not mandate that group health plans cover expenses for mental health services at residential treatment centers. BCBSG argues that because the Departments declined to address the "scope of services" issues, the IFRs permitted the Plan's exclusion of coverage for residential treatment. Moreover, BCBSG argues that until

---

[45] *Id.* The Tenth Circuit uses the terms "arbitrary and capricious" and "abuse of discretion" interchangeably in the ERISA context. *Weber v. GE Grp. Life Assurance Co.*, 541 F.3d 1002, 1010 n.10 (10th Cir. 2008) (citation omitted).

[46] Defendant's Motion at BCBS 0157; BCBS 0275, and BCBS 0390.

[47] *See Foster v. PPG Indus. Inc.*, 693 F.3d 1226, 1233 (10th Cir. 2012).

[48] Plaintiff's Motion at 12; Defendant's Motion at 18.

the Final Rules were effective, January 1, 2015 for this Plan, that skilled nursing facilities and residential treatment centers were not considered analogous and therefore BCBSG was not required to provide coverage for residential treatment.[49] Finally, BCBSG asserts that the Final Rules are not retroactive.

BCBSG relies on cases from other jurisdictions to support its arguments that the Departments' failure to address the "scope of services" issue in the IFRs permits group health plans to deny coverage for residential mental health treatment and that the Final Rules are not retroactive. In *P. v. Catholic Health Initiatives*,[50] the Western District of Washington granted defendant's motion for summary judgement after concluding the "[IFRs] specifically invited further comment on [the scope of services] issues," and as such, the IFRs did not require such coverage.[51] It also agreed with the defendant that the Final Rules were not retroactive.[52] In a similar case, *S.S. v. Microsoft Corp. Welfare Plan*, the Western District of Washington granted the insurance company's motion to dismiss after reasoning that the "IFRs did not provide guidance with respect to types of treatment centers within the scope of coverage...."[53] "[P]rior to the Final Rules, it was not clear that the Defendant could not exclude coverage for room and

---

[49] BCBSG also argues that the Departments' interpretation and implementation of the Parity Act, as set forth in the IFRs and Final Rules is entitled to deference pursuant to *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). However, *Chevron* does not apply here. *Chevron* only applies where an agency has actually answered a specific issue not addressed by the statutory language. *See Natalie V.* at *15-*16, footnote 13, (citing *Chevron* at 843). "If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, *as would be necessary in the absence of an administrative interpretation.*" *Id.* (emphasis added). The Departments specifically declined to address the "scope of services" issue in the IFRs. *Natalie V.* at *16 (citing Preamble, IFRs, 75 Fed. Reg. at 5416). There is no "administrative interpretation" deserving deference. The IFR's express omission of treatment of the "scope of services" issue does not endorse treatment-setting limitations. Such limitations would be contrary to the Act.

[50] *P. v. Catholic Health Initiatives*, 2016 WL 3551972 (W.D. Wash. June 30, 2016).

[51] *Id. at *6.*

[52] *Id.*

[53] *S.S. v. Microsoft Corporation Welfare Plan*, 2015 WL 11251744, at *6 (W.D. Wash. 2015).

board at residential treatment centers."[54] The Western District of Washington again agreed with the insurance company that the Final Rules "introduce new limitations not previously required of plans, and that…[the Final Rules]… cannot be applied retroactively.[55]

Essentially, both decisions held that residential mental health treatment exclusions were permissible under the IFRs. The problem with relying on these decisions is that the IFRs are interpretive rules. Interpretive rules do not have the force of law; they do not create rights, but merely clarify an existing statute or regulation. The Departments' express silence on the "scope of services" issue in the IFRs "does not constitute an endorsement of treatment setting limitations."[56] "Where the IFRs [are silent]… the Parity Act controls whether a group health plan provided mental health benefits in parity with medical/surgical benefits."[57]

*Joseph and Gail F. v. Sinclair Services Company* reasoned that "if a [plan] is going to cover treatment received at a skilled nursing facility, which provides only medical and surgical treatment, then the Parity Act requires [the plan] also cover treatment received at a residential treatment facility, which provides only mental health and substance abuse disorder treatment."[58] It is clear that "the Parity Act does not require a plan to provide mental health or substance use benefits at all."[59] "But once a plan does provide such benefits, the plan must do so on a level that

---

[54] *Id. at 7.*

[55] *Id.* at 7.

[56] *Natalie V.*, 2016 U.S. Dist. LEXIS 123783, at *18 (citing *Cf. Craft v. Health Care Serv. Corp.*, 84 F. Supp. 3d 748, 756 (N.D. Ill. 2015) (rejecting the defendant's due process defense and concluding that "[i]t would be a stretch to conclude from the Departments' request for comments that it was authorizing issuers to enforce treatment-setting limitations. They simply were not prepared to issue guidance at that time.")).

[57] *Natalie V.,* 2016 U.S. Dist. LEXIS 123783, at *18.

[58] *Joseph and Gail F. v. Sinclair*, 158 F.Supp.3d 1239, 1261 (D. Utah 2016) (holding that the ERISA health plan's residential treatment exclusion violated the Parity Act because it was a separate treatment limitation applicable only with respect to mental health benefits).

[59] 29 U.S.C. § 1185a(b)(1).

is on par with the benefits it provides for medical and surgical benefits. And once provided, the Parity Act prohibits imposing treatment limitations applicable only to mental health benefits."[60]

Moreover, skilled nursing facilities were the equivalent to residential treatment centers prior to the Final Rules being issued. In *Natalie V. v. Health Care Service Corporation*,[61] the Northern District of Illinois thoroughly reviewed the Parity Act and wrote an organized, well-reasoned and articulate order, which is the basis of this Order. The facts of *Natalie V.* are similar to this case in that the plan covered services received at skilled nursing facilities. However, the plan in *Natalie V.* categorically excluded coverage for mental health benefits at residential treatment centers. B.D.'s plan excluded coverage for "[r]esidential [t]reatment [c]enters [u]nless required to be covered by law."[62] *Natalie V.*'s plan had no reference to law.

*Natalie V.* decided that the Parity Act required the insurer to cover plaintiff's residential treatment for her mental health issues. Natalie V.'s claims were incurred in 2014, when the IFRs, not the Final Rules, were in place. The insurance company argued that the Final Rules "contain a new provision" establishing that skilled nursing facilities for medical/surgical conditions are analogous to residential treatment centers for mental health.[63] But *Natalie V.* stated "the Final Rules only confirmed what group health plans had already determined, namely, that residential treatment centers are the mental health counterpart to skilled nursing facilities."[64] Because the plan in *Natalie V.* had no clause subordinating its exclusion to the law, the plan in *Natalie V.* was

---

[60] *Joseph,* 158 F.Supp.3d 1239, at 1261.

[61] *Natalie V.*, 2016 U.S. Dist. LEXIS 123783.

[62] Defendant's Opposition at BCBS 0161. The 2014 SPD has a slight variation of this language, "Residential Treatment Centers Unless we must cover them by law." Defendant's Motion at BCBS 0278.

[63] *Id.* at *15.

[64] *Id.* at *14.

held to violate the law. But the plan at issue here is expressly subordinate to the law, which *Natalie V.* held requires coverage for residential treatment. This opinion agrees.

"Before issuing the Final Rules, the Departments investigated the…impact of the Parity Act, the IFRs and the Final Rules."[65] "In analyzing the costs attributable to the Final Rules, 'the Departments d[id] not expect much change in how most plans consider intermediate behavioral health care'…because [it] found that group health plans already analogized residential treatment for mental health and skilled nursing facilities for medical/surgical conditions."[66] Specifically, the Departments stated "Behavioral health intermediate services are generally categorized in a similar fashion as analogous medical services; for example, residential treatment tends to be categorized in the same way as skilled nursing facility care in the inpatient classification."[67] This shows that the Departments, and perhaps group health plans, already considered skilled nursing facilities to be analogous to residential treatment centers prior to the issuance of the final rules and that this was their interpretation of the Parity Act.

The Plan for 2013 and 2014 covered skilled nursing facilities, rehabilitation services and hospice care, and covered residential treatment centers if it was required to do so by law. BCBSG's interpretation of the Plan was that it was not required by law to cover residential treatment centers and denied Plaintiffs' claims stating residential treatment was not a covered benefit. The practical effect of BCBSG's interpretation is that Plaintiffs received less coverage for mental health services than another participant would have received for medical/surgical benefits. This is at odds with the Parity Act's purpose to achieve coverage parity whenever a plan offers both mental health and medical/surgical benefits. Additionally, a skilled nursing

---

[65] *Id.* at *14 (citing Preamble Final Rules 78 Fed. Reg. at 68253-54).

[66] *Id.*

[67] 78 Fed. Reg. 68240-01, 68260.

facility is analogous to a residential treatment facility and this was known prior to the Final Rules being issued. Therefore, BCBSG's interpretation that it was not required to cover B.D.'s 2013-2014 claims for S.D.'s treatment at a residential treatment center under the Plan, violates the Parity Act and misinterprets the Plan. The lack of a rule does not change the effect of the Parity Act. Benefits will be awarded for Plaintiffs' claims incurred before January 1, 2015.

### 2. Benefits Incurred on or After January 1, 2015.

#### a. Standard of Review.

B.D. contends that BCBSG forfeited any deference for review of benefits incurred after January 1, 2015, because it violated the requirements of ERISA's claim procedure regulations by failing to consider B.D.'s timely appeal.

On December 29, 2014 B.D. requested "a full, fair and thorough [review] of [S.D.]'s claims for the intermediate residential treatment she [was] receiving at Uinta for dates of service August 8, 2013, and going forward." In a letter dated February 24, 2015, BCBSG stated it would not consider B.D.'s appeal because it was not within 180 days from the July 21, 2014, denial letter.[68] Then 20 days later on March 16, 2015, BCBSG wrote a second letter indicating that BCBSG finished reviewing the appeal "…[and] [t]he previous coverage decision is being upheld.[69]

To support his argument that BCBSG violated the ERISA claims procedure, B.D. cites to *Kellogg v. Metropolitan Life Ins. Co*[70] and *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*[71] Both cases involved decisions under ERISA plans that failed to comply with the time frames within

---

[68] Defendant's Motion at BCBS 0001-8.

[69] BCBSG's denial letter dated March 16, 2015, Defendant's Motion at BCBS 0043.

[70] 549 F.3d 818, 827 (10th Cir. 2008).

[71] 585 F.3d 1311, 1318 (10th Cir. 2009).

which the administrators were required to render decisions on appeal of a denied claim. In both cases, the Tenth Circuit held that a de novo standard of review applied due to the insurer's failure to timely respond to plaintiff's appeal.

The Plan states that after review of the grievance, BCBSG "will provide a written decision, including reasons, within thirty (30) calendar days of receiving the Grievance. If special circumstances require a longer review period, we will provide our written decision within sixty (60) calendar days of receiving the Grievance. If we need the extra days, we will notify you of the reason why, and when a decision may be expected." [72] The administrative record shows BCBSG failed to notify B.D. of its denial decision within the time-frame required by the Plan and the record does not include any notification that BCBSG required extra days to make a decision. The Tenth Circuit has applied de novo review where procedural irregularities exist, such as the plan administrator's failure to comply with time limits in deciding an administrative appeal.[73] As to benefits for services incurred after January 1, 2015, a de novo standard of review applies.

### b. B.D. exhausted administrative remedies.

On January 1, 2015, the Plan changed and provided coverage for mental health services at residential treatment centers if they were medically necessary. BCBSG contends that B.D.'s claims for benefits in 2015 is barred for failure to exhaust internal review procedures because he never appealed later denial of benefits.

---

[72] Defendant's Motion at BCBS 0176, 0294, and 0409.

[73] *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F. 3d 789, 796 (10th Cir. 2010) (applying de novo review where the plan administrator resolved the administrative appeal 170 days after receiving the appeal instead of within 60 days as required by ERISA regulations and plan provisions). *See also Rasenack*, 585 F.3d at 1315–1318 (de novo review applied where plan administrator unduly delayed both in initially deciding the claim and in resolving the subsequent appeal); *Hancock v. Metro Life Ins. Co.,* 590 F.3d 1141, 1152 (10th Cir. 2009) ("de novo review may be appropriate if the benefit-determination process did not substantially comply with ERISA regulations").

B.D. argues he appealed the denial of coverage from August 8, 2013 going forward and that BCBSG improperly failed to consider his request for an appeal for the dates of service from August 2013, forward.

B.D. is correct. The December 29, 2014, appeal letter stated "I request you complete a full, fair and thorough level one internal member appeal of [S.D.]'s claims for the intermediate residential treatment she is receiving at Uinta, for dates of service August 8, 2013 and going forward, as she remains in treatment."[74] The plain language of B.D.'s appeal shows he was requesting a review of services from August 8, 2013, going forward. BCBSG's final denial letter dated March 16, 2015, determined that B.D.'s claim was denied correctly, because "[a]cording to the 'What's Not Covered' section in your [SPD], residential treatment centers are not covered, unless required by law."[75]Additionally, this letter states that "[i]f you don't agree with this decision you may ask for a *voluntary* second level appeal."[76] The letter also states if you have an ERISA plan "and you have exhausted all mandatory grievance rights, you have the right to bring a civil action in federal court under section 502(a)(1)(B) of ERISA."[77]

Under the Grievance and External Review Procedures in the SPDs, a grievance is a written complaint regarding "your dissatisfaction with our administration or claim practices…a determination of a diagnosis or level of service or a denial of a claim that you think should be paid by us."[78] The SPDs require that the grievance must be in writing and provide pertinent information such as the reason for requesting the review and if it is not claim related to "please

---

[74] Defendant's Motion at BCBS 0007.

[75] Defendant's Motion at BCBS 0043.

[76] *Id*. at BCBS 0045 (emphasis added).

[77] *Id.*

[78] *Id.* at BCBS 0176, 0294, and 0409.

include a description of the problem and the resolution you are looking for."[79] Although claims for future service had not been incurred, B.D. followed the Plan SPDs and filed a written request asking for BCBSG to review the claims for the dates of service from August 2013 and going forward as S.D. remained in treatment. B.D. complied with the Plan and BCBSG chose not to consider his appeal for the dates of service August 8, 2013 going forward. The grievance section of the SPDs does not state multiple appeals are required and offers no other information for a participant to determine when a participant has complied with the Plan to exhaust all administrative remedies. B.D. exhausted his administrative remedies under the Plan and because the plan required coverage for residential treatment, benefits will be awarded for Plaintiffs' claims incurred on or after January 1, 2015.

### 3. Remand is inappropriate.

BCBSG argues that it is entitled to summary judgment on Plaintiffs' claims, but in the alternative, claims the case should be remanded back to BCBSG which has discretionary authority to review S.D.'s medical history and claims to determine if the treatment was medically necessary and for how long. BCBSG argues that remand is proper where "there are 'factual determinations' that have not yet been made, but need to be made."[80]

B.D. claims remand is improper because the only reason BCBSG gave for the denial was that the service was not a covered benefit. B.D. argues BCBSG should not now be permitted to question whether the services were medically necessary.

In *Spradley v. Owens-Illinois Hourly Employees Welfare Benefit Plan*, the administrator did not fail to make inadequate findings; "rather, the Plan administrator gave a reason for

---

[79] *Id.*

[80] Defendant's Opposition at 24 (citing *Williams v. Int'l Paper Co.*, 227 F.3d 706, 715 (6th Cir. 2000); *Canseco v. Construction Laborers Pension Trust for So. California*, 93 F.3d 600, 609 (9th Cir. 1996).

denying benefits that was simply incorrect under the terms of the Plan, then later tried to come

up with a more plausible reason for the denial of benefits."[81] "[T]he federal courts will consider

only 'those rationales that were specifically articulated in the administrative record as the basis

for denying a claim'.... A plan administrator may not 'treat the administrative process as a trial

run and offer a post hoc rationale in district court.'"[82] And in *Harlick v. Blue Shield of*

*California*, the 9th Circuit held that "a court will not allow an ERISA plan administrator to assert

a reason for denial of benefits that it had not given during the administrative process."[83]

Specifically, "[a plan administrator] had to tell [plaintiff] the 'specific *reasons* for the denial' –

not just one reason, if there was more than one – and provide a '*full* and fair review' of the

denial."[84]

     All but four of the Explanation of Benefits ("EOBs") for the time that S.D. was at Uinta

state the reason for denial was that "[t]his type of service must be preauthorized or no benefits

are payable."[85] It is undisputed that Plaintiffs did not seek preauthorization prior to S.D.'s

admission at Uinta. However, Uinta requested preauthorization after S.D. was admitted and in

the July 21, 2014 letter BCBSG stated "[y]our request for prior approval for the above service

was received…Our records indicate that the requested service is not a covered benefit…"[86] In

BCBSG's March 16, 2015 denial letter, it upheld its previous decision and again stated

---

[81] *Spradley v. Owens-Illinois Hourly Employees Welfare Benefit Plan*, 686 F.3d 1135, 1142 (10th Cir. 2012).

[82] *Id*. at 1140-1141 (quoting *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co., 491 F.3d 1180, 1190-1191 (10th Cir.2007))*.

[83] *Harlick v. Blue Shield of California*, 686 F.3d 699, 719-720 (9th Cir. 2012).

[84] *Id*. at 720 (quoting 29 U.S.C. § 1133 (emphasis added)).

[85] Defendant's Motion at BCBS 0467-0536. The EOBs for June, August and September 2014 reference that the claim was denied because the service was not medically necessary. The EOB for July 2014 states that the claim is denied because there may be insurance from another source. See Defendant's Motion at BCBS 0486, 0493, 0489 and 0492.

[86] *Id*. at BCBS 0010.

residential treatment centers are not a covered benefit. As in *Spradley* and *Harlick*, BCBSG should be prohibited from now asserting a new reason for denying B.D.'s claims, such as claiming that the services were not medically necessary. 29 U.S.C. § 1133 required BCBSG to state all the reasons the claims were denied. The Tenth Circuit has determined where the plan administrator's reasoning to deny a participant's claim was rejected, the district court should enter judgment in favor of plaintiff rather than remand for further administrative proceedings.[87] In this case, remand would be inappropriate.

### 4. Prejudgment interest and attorney's fees and costs.

Finally, B.D.'s request for prejudgment interest is granted. In an ERISA case "[p]rejudgment interest…is available in the court's discretion."[88] "This is because ERISA permits a participant to seek 'appropriate equitable relief.'"[89] "Calculation of the rate for prejudgment interest also 'rest firmly within the sound discretion of the trial court.'"[90] "Courts commonly look to state statutory prejudgment interest provisions as guidelines for a reasonable rate."[91] U.C.A. §15-1-1(2) states "Unless parties to a lawful contract specify a different rate of interest, the legal rate of interest for the loan forbearance of any money, goods, or chose in action shall be 10% per annum." Plaintiffs contend that they should be awarded prejudgment interest at 10% as called for under U.C.A. §15-1-1, to compensate for the loss of use of funds. Plaintiffs are awarded prejudgment interest at a rate of 10%.

---

[87] *Spradley*, 686 F.3d 1135, at 1142-1143.

[88] Weber v. GE Group Life Ass. Co., 541 F.3d 1002, 1016 (10ᵗʰ Cir. 2008) (citation omitted).

[89] *Id*. (citing 29 U.S.C. § 1132(a)(3)(B).

[90] *Id.* (citation omitted).

[91] *Id*.

B.D.'s request for attorney's fees and costs is granted. Pursuant to 29 U.S.C.§ 1132(g) reasonable attorney's fees and costs are available to either party in an ERISA action.[92] A grant of attorney's fees under ERISA should not be a matter of course.[93] A court may award, in its discretion, fees and costs as long as the fee claimant has achieved "some degree of success on the merits."[94] In determining whether to award fees, the following factors should be considered: (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to personally satisfy an award of attorney's fees; (3) whether an award of attorney's fees against the opposing parties would deter others from acting under similar circumstances; (4) whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions.[95] These factors are guidelines, and while courts need not consider each factor, no single factor should be held dispositive.[96]

Regarding the first factor, while BCBSG did not act in bad faith, there is some culpability because of BCBSG's failure to respond to B.D.'s appeal within the time constraints designated by the Plan and not fully responding to B.D.'s appeal for the dates of service from August 8, 2013, going forward. As to the second factor, ability to pay is not a determinative factor, but BCBSG is in a position to pay attorney's fees. With regard to the third factor, an award of fees would have some deterrent effect on other plan and plan administrators under similar circumstances. This case involves a significant legal question — whether prior to the Final

---

[92] *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 244, 130 S.Ct. 2149, (2010) (citing 29 U.S.C. § 1001 *et seq.*, 29 U.S.C. § 1132(g)(1)).

[93] *McGee v. Equicor-Equitable HCA Corp.*, 953 F.2d 1192, 1209 (10th Cir. 1992).

[94] *Id.* at 245 (quoting *Ruckelshaus v. Sierra Club, 463 U.S. 680, 694, 103 **S.Ct**. 3274, 77 L.Ed.2d 938 (1983)*).

[95] McGee at 1209 (quoting *Gordon v. United States Steel Corp., 724 F.2d 106, 109 (10th Cir. 1983)*).

[96] *Id.* (citing *Gray v. New England Tel. & Tel. Co., 792 F.2d 251, 258 (1st Cir. 1986)*).

Rules, the Parity Act required group health plans to provide coverage for mental health services at a residential treatment center if the plan also covered medical/surgical benefits in a skilled nursing facility. Other plan participants will almost certainly benefit from B.D.'s litigation in this case. Therefore, in light of these factors, an award of reasonable attorney's fees and costs is appropriate.

### E. ORDER

IT IS HEREBY ORDERED that

(1) Plaintiffs' Motion for Summary Judgment and Memorandum in Support[97] is GRANTED.

(2) Defendant Blue Cross and Blue Shield of Georgia, Inc.'s Motion for Summary Judgment and Supporting Memorandum[98] is DENIED.

(3) Benefits are awarded to Plaintiffs.

(4) Plaintiffs are awarded prejudgment interest and reasonable attorney's fees and costs.

(5) This Order shall be filed under seal, due to Defendant BCBSG's Sealed Motion for Summary Judgment. The sealing of court documents is highly discouraged. Within 14 days of this Order, Defendant BCBSG shall file a redacted version of this Order pursuant to DUCivR 5.2-1 and 5-3.

The parties are directed to meet, confer, and file within 28 days of the date of this Order a report stating the status of this case moving forward, including a proposed briefing schedule on the issues of damages, prejudgment interest, and attorney's fees and costs. If any of these cannot be resolved by agreements, motions shall be filed within 42 days of the date of this Order.

---

[97] Docket no. 39, filed September 18, 2017.

[98] Docket no. 41, filed September 18, 2017.

The clerk of the court is directed to CLOSE this case.

Dated January 18, 2018.

BY THE COURT:

David Nuffer
United States District Judge